| | | |
|---|---|---|
| RYAN L. BELCHER and | ) | |
| DARAINA GLEASON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:05-CV-101-TLS |
| | ) | |
| VAUGHN NORTON and | ) | |
| THE TOWN OF ORLAND, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

This lawsuit arose out of events that occurred when the Plaintiffs, Ryan L. Belcher and Daraina Gleason, went to Bill's Professional Towing and Repair lot in Orland, Indiana, to retrieve personal items from their impounded minivan. The Defendant, Vaughn Norton, who was the acting Orland Town Marshal, was called to Bill's Towing after a dispute arose between the Plaintiffs and the lot's owner. The Plaintiffs allege that Norton, along with the owner of Bill's Towing and two other employees of the lot, extorted the minivan from them when they would not let them leave unless they immediately paid the towing and storage fees or signed title of the van over to Bill's Towing. They allege that Norton threatened Belcher with arrest for disorderly conduct if Gleason did not transfer the van's title to Bill's Towing. Gleason contends that rather than risk arrest or physical harm, she gave up her title to the van, at which point she and Belcher were allowed to leave. The Plaintiffs are African-American. All the other individuals involved in the incident are white.

The Plaintiffs invoked 42 U.S.C. §§ 1981, 1982, 1983, and 1985 to sue Vaughn and the Town of Orland. The Plaintiffs' Second Amended Complaint alleges that they were illegally

detained and arrested without probable cause, their procedural and substantive due process rights were violated, and they were denied the benefits of equal protection under the laws of the United States on the basis of their race.

The Plaintiffs also sued Bill's Towing and its owner and employees for various torts and for conspiring to deprive them of their civil rights under § 1985. These Defendants were dismissed by way of a Stipulation of Dismissal filed by the parties on June 23, 2006, and approved by the Court on June 26.

This matter is before the Court on a Motion for Summary Judgment filed by the remaining Defendants, Norton and the Town of Orland, on April 19, 2006. The Plaintiffs responded to the Motion on June 1 and the Defendants replied on June 20.

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate—in fact, is mandated—where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v.*

*Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted). "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.'" *Abrams v. Walker*, 307 F.3d 650, 653 (7th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Federal Rule of Civil Procedure 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Anderson*, 477 U.S. at 248–50. Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Juarez v. Ameritech Mobile Commc'ns, Inc.*, 957 F.2d 317, 322 (7th Cir. 1992). Conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment. *Haywood v. N. Am. Van Lines, Inc.*, 121 F.3d 1066, 1071 (7th Cir. 1997).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but

instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249–50; *Doe*, 42 F.3d at 443.

## STATEMENT OF MATERIAL FACTS

The following facts are stated in a light most favorable to the Plaintiffs.

On February 27, 2004, the transmission in Gleason's 1988 Plymouth Voyager minivan failed while she was driving on the Indiana Toll Road in Steuben County. Belcher, who was Gleason's fiance, was also in the van. Gleason got a ride to Fort Wayne, where the couple had been heading, and Belcher stayed with the van. He fell asleep in the driver's seat and was awakened by an Indiana State Trooper who stopped to question him. The Trooper arrested Belcher (he did not have a driver's license) and the van was towed to Bill's Towing in Orland, Indiana.

On March 1, 2004, Belcher and Gleason borrowed a friend's car and drove to Bill's Towing to get personal items out of the van. When they arrived at Bill's Towing, they spoke to the owner and operator, Wilburn McClanahan, about getting some court documents and personal items out of their van. McClanahan did not believe that he had their van, so Belcher called the State Trooper to verify the van's location. While waiting for verification, Belcher drank a beer in the bar across the street.

When Belcher and Gleason returned to Bill's, Belcher told McClanahan that he had verified that the van had been towed to Bill's Towing. McClanahan then told him that it was in the tow yard just down the road. The Plaintiffs drove to the tow yard where another employee of Bill's showed them where the van was parked.

Belcher went to the van and opened the sliding passenger door. He retrieved items and gave

them to Gleason, who carried them to the car. When the Bill's Towing employee told Belcher that he was only supposed to be removing court documents, Belcher responded that he was taking all of their stuff. The employee then called McClanahan who came to the tow yard. Belcher was in the process of removing a radio from the van when McClanahan asked Belcher if he planned to pay the storage and towing fee. Belcher said that he did, but did not have the money with him. He said he wanted to call his mother to see if she would lend him the money to get the van back. By this time, another employee of Bill's had arrived and was standing by McClanahan and the other employee.

Belcher asked if he could call his mother to make arrangements for payment. McClanahan denied the request and stated that because the Plaintiffs had removed property from the van, they would have to pay for it immediately. Bill's Towing has a policy that nothing can be released from an impounded vehicle, unless the items are of an "emergent or exigent nature," until the bill is paid in full or it has received notice from an insurance company. One of the employees indicated that it appeared that the Plaintiffs were "dumping" the van on Bill's Towing and just planned on taking their personal items and leaving. When someone mentioned signing over the title to the van, Belcher said that he might just do that if it would make up for the tow fee, but that he would like to first call his mother to see if he could arrange to pay the charges. Again, Belcher was told he could not use the phone.[1]

By this time, Belcher and McClanahan were both talking loudly and McClanahan was demanding that the Plaintiffs pay the fee or transfer title of the van. McClanahan and the other employees were standing around the Plaintiffs. McClanahan said that he was going to call the police,

---

[1] Belcher did not have his own phone and it is not clear from the record what phone he intended to use.

to which Belcher agreed. Shortly thereafter, Norton arrived at the tow yard in a red city truck.[2]
Belcher and Gleason were still removing items from the van. Belcher and McClanahan continued
to argue with Norton telling the Plaintiffs that they were not allowed to leave unless they signed over
the title or paid for the van and Belcher stating that he needed to call his mom to see if she would
lend him the money and to make arrangements. Belcher declared that they could not make him sign
over title and asked that the State Troopers be called. Norton responded that there was no need to
do that because he was "the law." (Belcher Dep. 64; Gleason Dep. 74.)

The Plaintiffs felt uncomfortable and intimidated because Norton, McClanahan, and the other
two employees were all standing around them. As the Plaintiffs walked away from the van to the
car, two of the men walked behind them and two walked in front. As they walked, Belcher and
Norton continued to argue whether the Plaintiffs could leave and whether they could be made to sign
over the title. When the Plaintiffs attempted to get in their car, Norton said that he would arrest
Belcher for disorderly conduct if Gleason did not sign over the title. Belcher asked to see a badge
and Norton, for the first time, produced one. Norton continued to tell Belcher that he would be
arrested for disorderly conduct if Gleason did not sign over the title and Belcher continued to declare
that Norton could not do that.

Belcher and Gleason got in the car, but they would not have been able to drive away from
the lot unless Norton and a Bill's Towing employee moved the trucks that were blocking the
Plaintiff's car. Norton then went to his city truck and got a pair of handcuffs. As he walked back to
the car, Belcher and Gleason got out. Norton again reiterated that if Gleason did not sign over title,

---

[2] On March 1, 2004, Deputy Marshall Norton was employed by the Town of Orland as Street
Superintendent. He was also the acting Town Marshal because the Town Marshall was deployed in Iraq. He went to
Bill's Towing after being informed by radio dispatch about disorderly persons. He was not in uniform because he
had been working as the Street Superintendent that day.

Belcher would be arrested. Belcher responded that Norton could not do that and Norton called for backup. Norton approached Belcher and when he was three to four feet away, Belcher crossed his arms indicating that he would not allow Norton to cuff him. Gleason was crying and telling Belcher to just let her sign the title so he would not be arrested. Belcher did not agree, but as Norton got closer to him, he told Gleason, "Just sign the damn thing."[3] Gleason then transferred title of the van, which the Plaintiffs believe is worth about $2000.

After Gleason signed over the title, the Bill's Towing employees and Norton left the tow yard. The Plaintiffs also left. They went to the local sheriff's department and local police station to file a complaint against Norton. When they were told there was no grounds to file a complaint, the Plaintiffs returned to Fort Wayne.

The Defendant's version of events differs in several areas and elaborates (without contradiction) in others. Norton contends that when he arrived at the tow yard, he displayed his badge and identified himself to the Plaintiffs as the Orland Town Marshal. He was advised that the Plaintiffs had been given permission to retrieve court papers from the impounded van, but that a dispute arose when the Plaintiffs began removing personal items and the radio. Norton was also advised that when McClanahan told Belcher that he could not remove the radio, Belcher became verbally abusive toward the Bill's Towing employees, stating that he was going to take whatever he wanted from the van. That is when McClanahan called the police. Norton's understanding was that if the Plaintiffs were unable to pay the impound charges, they could sign over the van's title to Bill's Towing. Norton explained to Belcher that it was his understanding that the Plaintiffs were

---

[3] According to Gleason, she was scared Belcher would be arrested and said, "I am stepping in and I will just sign the title over." (Gleason Dep. 78.)

only let into the impound yard to retrieve court documents, but nothing else. Norton contends that Belcher was very uncooperative and belligerent toward him and appeared to be drunk. Based upon this behavior and his continued removal of items from the van, Norton told Belcher that he might be arrested for disorderly conduct. Norton called the Steuben County Sheriff's Department to request back-up assistance and approached Belcher with handcuffs. He cancelled the back-up call when he heard Belcher tell Gleason to sign over the title.

**DISCUSSION**

**A.      Section 1983 Claims for Unlawful Seizure Under the Fourth Amendment**

Section 1983 provides a cause of action against government employees who, acting under color of law in their official capacity, violate the constitutional rights of another. 42 U.S.C. § 1983. These government officials, however, are sheltered from civil liability in their individual capacities as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (qualified immunity); *Montville v. Lewis*, 87 F.3d 900, 902–03 (7th Cir. 1996). This qualified immunity protects all but the plainly incompetent and those who knowingly violate the law. *McDonnell v. Cournia*, 990 F.2d 963, 969 (7th Cir. 1993). Once a defendant raises a qualified immunity defense, the plaintiff bears the burden of demonstrating: (1) that a constitutional violation transpired, and (2) that the pertinent constitutional standards were clearly established at the time of the alleged violation. *Erwin v. Daley*, 92 F.3d 521, 525 (7th Cir. 1996); *Clash v. Beatty*, 77 F.3d 1045, 1047 (7th Cir. 1996).

Therefore, the first question in this case is whether any constitutional violation transpired.

*See Saucier v. Katz*, 533 U.S. 194, 201 (2001) (explaining that threshold question in two-step qualified immunity inquiry is whether the alleged facts, taken in the light most favorable to the party asserting the injury, show that the defendant's conduct violated a constitutional right). The constitutional right implicated in this case is derived from the Fourth Amendment. The Fourth Amendment grants the right "of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. Amend. 4. The Plaintiffs contend that they were unlawfully detained or, in Fourth Amendment terminology, seized because they reasonably believed that they were not free to leave the tow yard. The Plaintiffs have stated a Fourth Amendment cause of action if (1) Norton's conduct constituted a "seizure" and (2) the seizure, if one occurred, was "unreasonable." *Kernats v. O'Sullivan,* 35 F.3d 1171, 1177 (7th Cir. 1994); *Donovan v. City of Milwaukee*, 17 F.3d 944, 948 (7th Cir. 1994).

Not every encounter between police and citizens is a seizure and even unreasonable, unjustified, or outrageous conduct by an officer is not prohibited by the Fourth Amendment if it does not involve a seizure. *Id.* A person is seized within the meaning of the Fourth Amendment if, in the view of all circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *see also United States v. Jacobsen*, 466 U.S. 109, 113 (1984) (holding that to establish that a seizure occurred, the person must show that there was a "meaningful interference, however brief, with an individual's freedom of movement"). There is also a subjective element; the citizen must "actually yield to a show of authority from the police or be physically touched by the police." *Id.* at 1178 (citing *California v. Hodari D.*, 499 U.S. 621, 625–26 (1991)).

> In seizure law, we believe that two overarching themes emerge from the cases: (1) the nature and degree of the official inducement, and (2) the extent of the restriction

on the citizen's desired freedom of movement. The first of these themes reflects the type of threatening police action, as noted in *Mendenhall*, and the cost of ignoring the official's demands, while the second informs whether the citizen had reasonable options available to him.

*Kernats*, 35 F.3d at 1178.

The Defendants contend that the Plaintiffs were not seized because Norton was not armed, did not actually touch the Plaintiffs, and only "threatened" to arrest Belcher. The Defendants argument is not persuasive because it ignores the Plaintiffs' allegation that Norton repeatedly told them that they could not leave the towing yard unless they first complied with his orders. This restriction on their freedom of movement was accompanied by Norton's show of authority, which included threatening Belcher with arrest and walking toward him with handcuffs. "A threat becomes more coercive as the cost of non-compliance increases relative to the cost of compliance; thus, it is reasonable to expect that a citizen's decision whether to comply with an official command would be informed by both the rock and the hard place." *Kernats*, 35 F.3d at 1179.

Norton's actions created such a dilemma for Belcher. His immediate choices were either to sign over title of the van or be arrested for, what he believed, were illegitimate charges. (Paying the towing fee was not a viable option because, according to the Plaintiffs, they were not allowed to call Belcher's mother to make payment arrangements and did not have the money with them). The Plaintiffs yielded to Norton's show of authority when they signed over the title. Only then were they allowed to leave the yard. This constitutes a seizure under the Fourth Amendment.

The fact that the Plaintiffs were seized, however, does not mean that the seizure was unreasonable, a necessary requirement for § 1983 liability. *See Donovan*, 17 F.3d at 949 (citing *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989)). To determine the constitutionality of a seizure the court "must balance the nature and quality of the intrusion on the individual's Fourth

Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). The Supreme Court has described the "balancing of competing interests" as "the key principle of the Fourth Amendment." *Id.* (citations omitted).

The Defendants argue that any seizure that occurred was reasonable under the circumstances because Bill's Towing had a possessory interest and a superior lien on the van under Indiana statute. They contend that Bill's Towing was not required to release the van or the property to the Plaintiffs, and the Plaintiffs had no right to remove the contents of the van, without first paying the lien. The Plaintiffs argue that there is no law permitting or allowing the arrest of an individual merely because he took personal belongings out of a van. They also contend that no reasonable police officer could have believed that Belcher committed the crime of disorderly conduct.

Here, the intrusion was restriction of movement and threatened arrest. Whether Belcher engaged in disorderly conduct to warrant this intrusion is disputed and presents an issue of fact. It is not disputed, however, that Belcher took property from a vehicle without the authorization, and over the protests, of the towing company owner. Because Belcher had not paid the towing and storage fees, a reasonable officer would be justified in believing that he was not entitled to take property from the vehicle and had committed a criminal offense. Gleason likewise participated in this unlawful conduct. Under these circumstances, Norton's refusal to let them leave the towing yard was not unreasonable. In fact, given the events taking place, Norton would have had probable cause to arrest the Plaintiffs for theft or criminal conversion. (Or, at the very least, it was not clearly established at the time of the alleged violation that it was unconstitutional to detain, or arrest, persons who were removing items from an impounded vehicle without the lien holder's

authorization). The fact that he did not actually arrest them (and that his threat to arrest Belcher involved a different offense) does not mean that it would have been unreasonable to do so on the basis that they were removing property from the impounded van. *See United States v. Garcia*, 376 F.3d 648, 651 (7th Cir. 2004) ("Reasonableness depends on facts, not labels."). Norton's actual intent has no place in a Fourth Amendment reasonableness determination. *See Scott v. United States*, 436 U.S. 128, 138 (1978) (noting that "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for [his] action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action") (citing *United States v. Robinson*, 414 U.S. 218 (1973)). Here, the circumstances, when viewed objectively, justify the seizure and Norton's intent makes no difference for Fourth Amendment purposes.

Norton's seizure was not unreasonable and the Plaintiffs' § 1983 claim against him for violation of the Fourth Amendment is dismissed. The Plaintiffs' Fourth Amendment claims against the Town of Orland are likewise dismissed because they have not created a triable issue on whether a constitutional violation occurred. *See Alexander v. City of South Bend*, 433 F.3d 550, 557 (7th Cir. 2006) (citing *Contreras v. City of Chi.*, 119 F.3d 1286, 1294 (7th Cir. 1997) (holding that city could not be liable unless it violated a constitutional guarantee); *Durkin v. City of Chi.*, 341 F.3d 606, 615 (7th Cir. 2003) (holding that a municipality cannot be found liable under § 1983 if there is no finding that the individual officer is liable on the underlying substantive claim).

**B.** **Section 1983 Claims for Violation of Procedural and Substantive Due Process**

*1.*      ***Procedural Due Process***

The Fourteenth Amendment's due process clause guarantees that the State will accord each person a certain process if he is deprived of life, liberty, or property (or right in a property). *See* U.S. CONST. amend. XIV, § 1. Under this provision, a plaintiff challenges not the deprivation itself but the deprivation without the required procedure. A procedural due process claim requires a two-step analysis. First, the court considers whether the plaintiffs were deprived of a constitutionally protected interest in life, liberty, or property. If such a deprivation occurred, the court then determines what process was due with respect to that loss. *Porter v. DiBlasio*, 93 F.3d 301, 305 (7th Cir. 1996) (citing *Siebert v. Severino*, 256 F.3d 648, 659 (7th Cir. 2001)).

The Defendants assert that because Bill's Towing had a lien on Gleason's impounded van under state law, she did not have a property interest in the van. Gleason does not dispute that Bill's Towing had a lien, but submits that she still had a property interest in the vehicle. The court agrees; even if Bill's Towing had a superior property interest in the van, the Defendants have not established that Gleason did not retain ownership. Although her title was not clear, Gleason did retain an interest in the van and the Defendants' attempt to argue that its lien forecloses her due process claim is not convincing. Thus, she was entitled to some process in connection with the State's acquisition of her van (for the benefit of Bill's Towing).[4]

The required procedures vary with each particular situation and must be evaluated in light

---

[4] There is no evidence that Belcher had a property interest in the van and he lacks standing to sue for denial of due process. As part of their due process claims, the Plaintiffs also argue that they were denied liberty without due process, but spend only one sentence in their Response Brief on this claim. By presenting only a skeletal and unsupported argument, the Plaintiffs have waived and forfeited their claim that they were deprived of their liberty in violation of the due process clause. *See United States v. McLee*, 436 F.3d 751 (7th Cir. 2006) (noting that it is not the obligation of the court to research and construct the legal arguments open to parties, especially those represented by counsel); *United States v. Cusimano*, 148 F.3d 824, 828 n.2 (7th Cir. 1998) (finding that appellant waived argument on appeal for failure to develop it).

of the private interest that will be affected by the official action, the risk of erroneous deprivation, and the government's interest and burden in administering the procedure. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Applying these considerations, the courts have usually held that the Constitution requires a hearing before the state deprives a person of his property. *See Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (citing Supreme Court cases).

"In some circumstances, however, the Court has held that a statutory provision for a postdeprivation hearing, or a common-law tort remedy for erroneous deprivation, satisfies due process." *Id*. at 128. Two situations in which such a postdeprivation remedy has been held sufficient were set out in *Parratt v. Taylor*, 451 U.S. 527 (1981):

> These cases recognize that either the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process.

*Id*. at 539, *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986).

Only the second scenario, the impracticability of providing any meaningful predeprivation process, is at issue in this case. This impracticability is created when persons acting under the color of law step over the boundaries and limits authorized by the law, such as a state official who is not acting in accordance with any established state procedure, but is pursuing his own personal vendetta against another. *See Hudson v. Palmer*, 468 U.S. 517, 521 (1984). When a state official abuses his powers either negligently or intentionally, "the state cannot predict precisely when the loss will occur. And if the state cannot predict when the loss will occur, it cannot provide a meaningful hearing before the deprivation takes place." *Wilson v. Civil Town of Clayton*, 839 F.2d 375, 380 (7th Cir. 1988) (citing *Parratt*, 451 U.S. at 541). "The state can no more anticipate and control in

advance the random and unauthorized intentional conduct of its employees than it can anticipate similar negligent conduct." *Hudson*, 468 U.S. at 533.

It appears that the Plaintiffs are asserting that Norton's actions were the result of such an unauthorized and random departure from the established state law governing impounded and abandoned vehicles. They argue that Gleason's van was not abandoned because Gleason had an additional two weeks to redeem the van before it would be considered abandoned under Indiana law. *See* Indiana Code § 9-13-2-1(6) (providing that a vehicle that has been removed by a towing service upon request of an officer is "abandoned" if the impounded vehicle is not claimed or redeemed by the owner within twenty days after removal). The Plaintiffs argue that Norton "re-wrote the law by forcing, under threat of arrest and handcuffing, Gleason to give the vehicle to Bill's within the first week of its impoundment period." (Pfs' Resp. 5.) They contend that the Defendants streamlined the procedure for declaring a vehicle abandoned under Indiana Code § 9-22-1-10 so Bill's Towing could get a free 1988 Plymouth Voyager minivan. (Pfs' Resp. 5.)

The above assertions support a conclusion that the Plaintiffs' deprivation was pursuant to "random and unauthorized action," not "an established state procedure." *See Hudson*, 486 U.S. at 532–33 (confirming the distinction between the kinds of deprivations). Whether an act is random and unauthorized depends on the state's point of view, not the actor's. *Clifton v. Schafer*, 969 F.2d 278 281–82 (7th Cir. 1992). Here, it cannot be argued that Norton's conduct was predictable and authorized from the state's position given the existing statutes governing the disposal and treatment of impounded and abandoned vehicles. The deprivation of property that the Plaintiffs complain about "was not one that the state could have predicted or, more importantly, prevented through the implementation of additional predeprivation procedural safeguards." *Easter House*, 910 F.2d at

1401. The deprivation of property was the result of Norton's ultimatum to either sign over title or be arrested for disorderly conduct. This course of conduct was not consistent with the procedures set forth in state law. Because the Plaintiffs point to nothing that would indicate that the state knew or should have known that Norton or other government officials had disregarded, or were likely to disregard, the state's established procedures for disposing of impounded cars, Norton's action were not predictable. *See id.*

However, the matter is not settled because, in addition to maintaining that Norton did not follow state law, the Plaintiffs also maintain that *Parratt* is not applicable because when the tortious loss of property is executed in accordance with official policy, it cannot be the result of a random and unauthorized act. (Pfs' Resp. 6) (citing *Wilson*, 839 F.3d at 380, for the proposition that "the procedural due process resolution of the *Monell* issue will also resolve [the] *Parratt* issue"). The Plaintiffs assert that the Town of Orland is liable for their loss because Norton was acting as the town's final policymaker. (Pfs' Resp. 6–7.) The Plaintiffs are correct in the sense that if Norton was acting pursuant to policy, the conduct is inherently not random or unauthorized and the *Parratt* analysis is inapplicable. *Wilson*, 839 F.2d at 380. Therefore, the Court must determine whether Norton's acts could be deemed to be the government's policy for purposes of the disposal and treatment of impounded vehicles.

The Court is again guided by the Seventh Circuit's opinion in *Easter House*. In that case, the court addressed the plaintiff's argument that a single act of a sufficiently high-ranking policymaker can be deemed established state procedure, thereby removing his action from the realm of random and unpredictable. *See id.* at 1402. The court recognized that the employee's position would be relevant to determining whether his actions automatically became the state's new position, or, when

viewed from the state's perspective, were merely a random and unauthorized deviation:

> If the policymaker establishes policy and procedure on an informal basis without the aid of formal policy and procedure guidelines—that is, decides policy on a case-by-case basis—then his pronouncement in a given case reflects the state's position. Thus, a party who suffers a loss without due process protection in his individual case may easily argue that the loss occurred as a result of an inadequate established procedure.

*Easter House*, 910 F.2d at 1403. On the other hand, where a policymaker, or series of policymakers, establish policy and procedure "through a deliberate, or even legislative, process which culminates in a certain concrete position expressed in a formal pronouncement, . . . only the results of that more formal process reflect the state's established policy and procedure." *Id.* If a policymaker "deviates in a single instance from the more formal pronouncement, it is less likely to reflect a new trend in state policy and procedure." *Id.*

> A shift in policy is only likely to occur in one of two situations. First, a shift occurs if the same formal steps which created the original policies and procedures are repeated and culminate in the pronouncement of new policy and procedures. Second, a state's position may change if the policymaker repeatedly deviates from the formally established policy and procedure until his practice and custom has replaced the formal policy and procedures.

*Id.*

This case reflects the second scenario involving a deliberate formal process. When Norton deviated from the state's established procedures regarding impounded vehicles, he did not create a new policy for the state in these matters. While Norton may have been, as the Plaintiffs' contend, a final policymaker, he was not such a policymaker with regard to the procedures affecting impounded and abandoned vehicles, which were established through the traditional legislative process. "In effect, the 'policymaker' was the state legislature." *Id.* Therefore, Norton's actions, even assuming he qualifies as a policymaker, does not preempt or displace otherwise adequate existing

state policy and procedure. *See id.* ("Because the state through its designated policymaking branches created its formal policies and procedures, we cannot entertain a claim that the single act of a state employee now reflects the state's established policies and procedures."). Gleason's loss of property was not executed in accordance with official policy and the Plaintiffs cannot avoid the implications of *Parratt.*

Because it was impossible for the State to provide the Plaintiffs with a predeprivation hearing before Norton required Gleason to turn over her property interest in the van, the Plaintiff's procedural due process claim turns on the availability of a postdeprivation procedure. The Defendants point to the Indiana Tort Claims Act as proof that Indiana law affords the Plaintiffs an adequate state tort remedy. In *Hossman v. Spradlin*, 812 F.2d 1019 (7th Cir. 1987), the court held that the Indiana Tort Claims Act provided a "constitutionally adequate remedy to redress property loss caused by a state officer and avoids appellant's claim that he was intentionally deprived of his property without due process of law." *Id.* at 1023.

Governmental entities and their employees are subject to liability for torts committed by them unless they can prove that one of the immunity provisions of the ITCA applies. *City of Hammond v. Reffitt*, 789 N.E.2d 998, 1001 (Ind. Ct. App. 2003). The Plaintiffs claim that the Indiana Tort Claims Act does not provide an adequate remedy in this case because it gives immunity to officers "attempting to apply law enforcement procedures." (Pfs' Resp. 4.) Presumably (they do not cite any specific statutory provision), the Plaintiffs are referring to Indiana Code § 34-13-3-3(8), a subsection of the ITCA commonly referred to as the "law enforcement immunity provision." *See East Chicago Police Dept. v. Bynum*, 826 N.E.2d 22, 26 (Ind. Ct. App. 2005). That section provides immunity to a governmental entity or an employee acting within the scope of his employment for

the "enforcement of or failure to . . . enforce a law (including rules and regulations), unless the act of enforcement constitutes false arrest or false imprisonment." Ind. Code § 34-13-3-3(8). The Defendants' briefs are completely silent on the issue of immunity under the ITCA.

The availability of immunity affects the plaintiffs' ability to obtain "adequate" and "meaningful" postdeprivation relief sufficient to provide the requisite due process protection. *See, e.g., Surplus Store Exch., Inc. v. City of Delphi*, 928 F.2d 788, 790 n.2 (7th Cir. 1991) (noting that Indiana law "may fail to provide an adequate remedy" because of applicable immunity provisions within the ITCA, but dismissing the case on other grounds); *Easter House*, 910 F.2d at 1406 (holding that immunity concerns did not affect otherwise adequate Illinois state law remedies because the immunity would not actually apply to the defendants' actions)."In other words, it can "readily be characterized as inadequate to the point that it is meaningless or nonexistent and, thus, in no way can be said to provide the due process relief guaranteed under the fourteenth amendment." *Easter House*, 910 F.2d at 1406. "While the issue of a governmental entity's immunity from liability under the ITCA may require extended factual development, the issue remains a question of law for the courts."

*Bynum*, 826 N.E.2d at 26.

The Court finds that Norton's actions do not constitute the "enforcement of law" and immunity under section 34-13-3-3-(8) would not apply. While responding to dispatch's notice of disorderly individuals at Bill's Towing would constitute the enforcement of a law as contemplated by section 34-13-3-3(8), Norton's actions, according to the Plaintiffs, quickly moved beyond the realm of activity that the legislature intended to sanction. *Cf. Bynum*, 826 N.E.2d at 30 (concluding that immunity did not apply when officer drove emergency vehicle in manner that violated statute

requiring him to drive with due regard for the safety of all persons even when pursuing gang members and warrant violator). The Plaintiffs' claims do not derive from Norton's enforcement or failure to enforce any laws. *See St. Joseph County Police Dept. v. Shumaker*, 812 N.E.2d 1143, 1150 (Ind. Ct. App. 2004) (defining enforcement as "compelling or attempting to compel the obedience of *another* to laws, rules, or regulations, and the sanctioning or attempt to sanction a violation thereof" and the failure to do such). Although the Defendants claim that Norton was attempting to compel the Plaintiffs to obey laws and sanction a violation of law, the Plaintiffs' story varies significantly. They assert that Norton used extortion methods to transfer Gleason's property interest in the van to Bill's Towing for the exclusive benefit of Bill's Towing. Granting immunity in these circumstances would not be consistent with the purpose of immunity, which "is to ensure that public employees can exercise their independent judgment necessary to carry out their duties without threat of harassment by litigation or threats of litigation over decisions made within the scope of their employment." *Savieo v. City of New Haven* 824 N.E.2d 1272, 1275 (Ind. Ct. App. 2005) (citing *Bushong v. Williamson*, 790 N.E.2d 467, 472 (Ind. 2003)).

Because the Defendants would not be immune from suit under the ITCA, Gleason has not shown that the state's postdeprivation remedies under the ITCA are not adequate to redress the unauthorized and random deprivation of her property. This is all the process she is due. Norton is entitled to summary judgment on the Plaintiffs' procedural due process claim for deprivation of Gleason's property interest in the van.

## 2.    *Substantive Due Process*

The Due Process Clause contains a substantive component that bars certain arbitrary,

wrongful government actions "regardless of the fairness of the procedures used to implement them." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (citing *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). A plaintiff bringing a substantive due process claim predicated on a deprived property interest must show 1) that the state's decision was arbitrary and irrational, and 2) that the state committed a separate constitutional violation or that state law remedies are inadequate. *Gable v. City of Chi.*, 296 F.3d 531, 541 (7th Cir. 2002); *Contreras v. City of Chi.*, 119 F.3d 1286, 1295 (7th Cir. 1997).

Because Gleason cannot satisfy the second prong, her substantive due process claim must be dismissed. She has not pointed to a separate constitutional violation and the Court has already determined that state law remedies are adequate.

Although it is not clear whether the Plaintiffs are also asserting that Norton's seizure of them states a claim for violation of substantive due process, such a claim would not survive summary judgment for the reasons articulated in the Court's discussion of the Plaintiff's Fourth Amendment claim. *See Kernats v. O'Sullivan*, 35 F.3d 1171, 1182 (7th Cir. 1994) (dismissing an allegation of an unlawful seizure because there is no need to differentiate between the Fourth Amendment theory and a substantive due process theory because they are coextensive).

## C.    Claims Under 42 U.S.C. §§ 1981, 1982, and 1985

The Plaintiffs also allege violations of 42 U.S.C. §§ 1981, 1982, and 1985. They claim that the Defendants conspired to deprive then of their liberty and of ownership of the van by detaining them and coercing them into signing over title.

Section 1985(3) provides in relevant part: "If two or more persons in any state or Territory conspire . . . for the purpose of depriving either directly or indirectly, any person or class of persons

of the equal protection of the laws . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." 42 U.S.C. § 1985(3).

A claim under § 1985(3) requires "'(1) the existence of a conspiracy, (2) a purpose of depriving a person or class of persons of equal protection of the laws, (3) an act in furtherance of the alleged conspiracy, and (4) an injury to person or property or a deprivation of a right or privilege granted to U.S. citizens.'" *Brokaw v. Mercer County*, 235 F.3d 1000, 1024 (7th Cir. 2000) (citing *Majeske v. Fraternal Order of Police, Local Lodge No. 7*, 94 F.3d 307, 311 (7th Cir. 1996)). The purpose of the conspiracy is to deprive a person or class of persons equal protection, if there is "some racial, or perhaps otherwise class-based invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971); *Brokaw*, 235 F.3d at 1024.

In support of their claim for conspiracy, the Plaintiffs contend that there is sufficient evidence to infer that the Defendants conspired to deprive them of equal protection of the laws on the basis of the relevant actors' races. (Pfs' Resp. 8.) ("Under the circumstances—all Defendants were Caucasian and Defendants were African-American—should be enough, under the facts of this case, to show that the Defendants were depriving Plaintiffs of equal protection of the laws."). The Plaintiffs argue these same facts in support of their claims under § 1981 and § 1982.

> There is no proof, and Defendants offered none, to show that similarly situated Caucasians would have been treated the same—boxed in, surrounded, threatened with arrest, approached with handcuffs. This evidence supports Plaintiffs['] claims under 42 U.S.C. § 1981, § 1982. There is no evidence either Vaughn Norton or Bill's Towing ever arrested and/or threatened arrest of an individual because he retrieved personal belongings out of an impounded vehicle—we are allowed to infer, therefore, this only happened to the Plaintiffs, who are black.

(Pfs' Resp. 8–9.)[5]

The Plaintiffs' argument inappropriately attempts to shift the burden of proof to the Defendants on an issue that it must prove. It is the Plaintiff's burden to show that racial animus drove the conspiracy.[6] *See, e.g., Alexander v. City of South Bend*, 433 F.3d 550, 557 (7th Cir. 2006) (dismissing conspiracy claim because the plaintiff did show the existence of a conspiracy or that anyone was motivated by racial animus). This burden is not met simply by pointing out that the Plaintiffs are black and the Defendants are not. *See. e.g., Glass v. Village of Sauk*, 1996 WL 149342, *2 (7th Cir. 1996) ("The only fact in the trial record that could even support an inference of racial animus on the part of Defendant is that [she] is an African-American and Defendant is not. Without question, that is not enough. *Minority Police Officers Ass'n of South Bend v. City of South Bend*, 801 F.2d 964, 967 (7th Cir. 1986)."); *Alexander v. City of South Bend*, 320 F. Supp. 2d 761, 779 (N.D. Ind. 2004) ("Aside from presenting the undisputed fact that Plaintiff is an African American, Plaintiff offers no evidence that Defendants['] investigation stemmed from any racial animosity, evidence necessary to sustain his [§ 1985] claim."). The Plaintiffs contend that the Defendants have not pointed to any legitimate reason for their actions. However, even the Plaintiffs' version of events and theory of the case presents a reason, other than race, for the Defendants' actions—they wanted ownership of the van. The method the Defendants are alleged to have used, detention and threat of arrest on bogus charges unless title was signed over, are not inherently based upon race, but on abuse of power for unlawful gain. *See, e.g.*, Pfs' Resp 8 (arguing that Bill's Towing employees

---

[5] This excerpt from the Plaintiffs' Response Brief is the only reference to § 1981 or § 1982 in the Plaintiffs' briefing.

[6] By focusing on the purpose element the Court does not suggest that the Plaintiffs have established that an actual conspiracy existed.

wanted money or the van and that Norton aided them in achieving this goal).

Where the nonmoving party has failed to make a showing sufficient to establish the existence of an essential elements to its case and on which it will bear the burden of proof at trial, summary judgment is mandated. *Celotex Corp*, 477 U.S. at 322. On the evidence presented, no fair minded and rational jury could return a verdict for the Plaintiffs on their claim that the Defendants conspired to deny them equal protection of the laws or otherwise discriminated against them on the basis of their race. Therefore, the Plaintiffs' §§ 1981, 1982, and 1985 claims are dismissed.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment [DE 61] is GRANTED. Judgment will be entered in favor of the Defendants and against the Plaintiffs Daraina Gleason and Ryan Belcher.

SO ORDERED on July 17, 2006.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT